UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

AUDREY DEMETRES,

       *Plaintiff,*

       *v.*

ZILLOW, INC.,

       *Defendant.*

Civil No. 3:21cv00802 (JBA)

September 21, 2022

**RULING ON MOTION TO DISMISS**

    This is a putative class action[1] for compensatory and punitive damages in which the Plaintiff, Audrey Demetres, alleges that the Defendant, Zillow, Inc.'s ("Zillow") on-line home buying platform utilizes unfair and deceptive tactics, resulting in the Plaintiff's financial losses.  Plaintiff brings this action pursuant to the Lanham Act, 15 U.S.C. § 1125(a), the Sherman Act, 15 U.S.C. §§ 1 and 2, the Connecticut Unfair Trade Practices Act, 42 Conn. Gen. Stat §110a, et seq., and under the common law tortious interference with contractual relationships.  Zillow has filed a motion to dismiss the amended complaint.  For the reasons that follow, the motion is granted in part and denied in part.

**I.**    **Facts Alleged**

    Plaintiff Demetres "is a real estate salesperson and/or real estate broker" residing in Fairfield, Connecticut. (Am. Compl. [Doc. # 5] ¶ 47.) Defendant is a corporation that "operates the nation's dominant home buying platform at Zillow.com, which purports to make the process of buying and selling residential real estate less complicated and lower priced." (*Id.* ¶¶ 1, 49.) According to Plaintiff, Defendant misuses its platform in two ways: through its featuring of Advertising Agents, and through its use of "Zestimates."

---

[1] There is no pending motion for class certification.

First, Plaintiff alleges that its "market dominance gives [Zillow] the power to tilt the real-world playing field in favor of its own favored customers." (*Id.* ¶ 7.) Defendant's customers are not homebuyers, but rather real estate agents ("Advertising Agents," as Plaintiff refers to them) who pay a fee to Defendant "so they can be associated with properties [with] which they do not have a listing relationship . . . ." (*Id.* ¶ 7-8.) According to the amended complaint, this practice "allows [Defendant] to artificially confer upon its paying customers the ability for them to do what they otherwise cannot do, which is to directly advertise to and directly solicit [] prospective homebuyers []via other agents' exclusive listings." (*Id.* ¶ 18.)

Plaintiff alleges that Zillow provides this benefit to the Advertising Agents to the detriment of both the listing agent and prospective homebuyers, the latter of which "are deliberately re-routed in their attempts to reach the actual listing agents for properties they are interested in, away from the agents with the most connection to the property." (*Id.* ¶ 12.) Such a "scheme causes the buyer to end up with an agent who – not being the listing agent – has a greater incentive to steer the buyer to a property other than the property that caused them to initiate the process in the first place." (*Id.* ¶ 23.) The "Advertising Agents have more, and a higher percentage of, buyer broker and dual agency transactions compared to non-participating agents." (*Id.* ¶ 29.) As a result, a consumer "enters into a commercial setting – defendant's dominant, prevailing digital platform – where he or she is substantially more likely to participate in a dual agency dynamic without the careful disclosures normally required." (*Id.* ¶ 32.)

As a result of Defendant's deceptive practices, Plaintiff has suffered "the loss of clients, sales, commissions and revenue." (*Id.* ¶ 11.) The Amended Complaint alleges that Defendant's conduct has "further caused market confusion and economic harm to consumers," (*id.*), because it "restricts the marketplace to the detriment of all consumers and participants in the residential real estate market." (*Id.* ¶ 20.)

Second, in addition to redirecting home buyers to its Advertising Agents, Defendant publishes "its own manufactured, artificial real estate market in the form of [its] Zestimate program."  (*Id.* ¶ 35.) A Zestimate consists of Defendant's "own, self-devised, internally-standardized opinion of the value of the particular property." (*Id.* ¶ 36.) The amended complaint alleges that the Zestimate program "illegally competes with the actual[] listing price that is developed through proper industry appraisal standards; and also through the listing agent's actual, personal, intimate knowledge of the property in question and the neighborhood where it is situated." (*Id.*) Plaintiff has suffered broken agreements with property sellers and buyers as a result of Defendant's Zestimates. (*Id.* ¶ 37.)

The combination of Defendant's Zestimate program and its collection of fees from Advertising Agents results in, inter alia, "*de facto* listing agreements," deception of agents, sellers and purchasers, publication of listings on the Multi Listing Services ("MLS")[2] in violation of agency policy and without being properly licensed, access to confidential information through purchase of other digital platforms, monopolization of the real estate market and "dominance, control and overarching pursuit of participation in every aspect of the market." (*Id.* ¶¶ 33-34.)

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sarmiento v. United States*, 678 F.3d 147, 152 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The complaint must be interpreted liberally, all allegations must be accepted as true, and all inferences must be made in the plaintiff's favor. *Heller v. Consolidated Rail Corp.*, 331 F. App'x.

---

[2] Plaintiff alleges "the loss of sales commissions to plaintiff, and others similarly situated, as a result of using [Plaintiff's and potential class members'] information from duly organized Multi Listing Services ("MLS") in a way that devalues, misappropriates and co-opts the MLS to appear affiliated with defendant's Premier Advertising Agents." (*Id.* ¶ 34c.)

766, 767 (2d Cir. 2009) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). Motions to dismiss "assess the legal feasibility of a complaint" and are not the place to "assay the weight of the evidence which might be offered in support" of the merits. *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.,* 432 F. Supp. 3d 131, 151 (D. Conn. 2019) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)). But a complaint that only "offers 'labels and conclusions'" or "naked assertions devoid of further factual enhancement" will not survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Rather, a complaint must plead factual allegations that "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and must be "plausible on its face," *id.* at 570.

### III.   Jurisdiction

Jurisdiction is proper pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332 (d)(2). Plaintiff has pled that the aggregate amount in controversy will be at least $5,000,000, and because Plaintiff's domicile is in Connecticut, and Zillow is a corporate citizen of Washington, Plaintiff has satisfied the requirements for minimal diversity under (d)(2)(A). (Am. Compl. ¶ 40-43).

### IV.   Discussion

#### A.   Standing

As standing is a "threshold matter we must resolve before reaching the merits," *Fair Hous. in Huntington Comm. v. Town of Huntington,* 316 F.3d 357, 361 (2d Cir.2003), the Court begins its analysis with Defendant's motion to dismiss for lack of standing. Defendant views the amended complaint as lacking any "factual allegations relating to Plaintiff's alleged harm or injury," that establish standing such as "dates, names, amounts, or other factual allegations supporting that she actually lost sales commissions due to any alleged conduct by Defendant." (Def.'s Mem. [Doc. # 7-1] at 7-8.) According to Defendant, the Amended

Complaint "does not provide any detail concerning the specific 'property listings' that appeared on Defendant's website, the specific Premier Agents who allegedly benefited as a result of the alleged misconduct, or any actual injury or loss she suffered as a result of Defendant's actions," nor "allegations relating to any agreements that were allegedly terminated due to the Zestimates." (*Id.* at 9.) Defendant also contends that allegations based on Zestimates cannot serve as the basis for Plaintiff's claims because "courts have already held that Zestimates are merely Defendant's 'best estimates' of property values, and as Plaintiff admits, nothing more than Defendant's 'opinion,'" (*Id.*) and Plaintiff "admits it was her refusal to list the subject properties at Zestimate amounts, rather than the Zestimates themselves, that caused her" alleged losses. (Def.'s Reply at 3.)

Plaintiff distinguishes the precedent cited by reference to her allegations concerning Defendant's "comprehensive attempt . . . to control the real estate market," coupled with statements that her actual clients broke listing agreements specifically because she would not recommend the Zestimate, as sufficient to confer standing. (Pl.'s Opp'n [Doc. # 10] at 9-10.) She further claims that the "breadth" of the amended complaint's allegations present "an intangible threat of potential harm" sufficient to support Article III standing. (*Id.* at 11.)

A party seeking to invoke a federal court's jurisdiction must "have standing—the personal interest that must exist at the commencement of the litigation.'" *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). The Supreme Court has recognized that "the 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quoting *Lujan*, at 560-61; *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth v.*

*Seldin*, 422 U.S. 490, 518 (1975)). To establish an injury-in-fact "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).

Defendant compares Plaintiff's deficient injury-in-fact allegations to *Parker Madison Partners v. Airbnb, Inc.*, 283 F. Supp. 3d 174 (S.D.N.Y. 2017). In that case, the plaintiff and purported class of licensed real estate brokers filed a putative class action against Airbnb[3] for "engaging in alleged unfair competition and conduct . . . by virtue of providing real estate brokerage services in New York without the licenses mandated by the New York Real Property Law ("RPL")," such that the plaintiff brokers were "harmed by a massive-scale market competitor that performs real estate brokerage services without a license and without oversight." *Id.* at 176-77. The court held that these allegations were insufficient to establish an "injury-in-fact" for purposes of Article III standing even examining "[t]he most specific allegation . . . that: '[a]s a result of Airbnb's conduct, Plaintiff and the putative class have suffered, and will continue to suffer, damage to their business, including but not limited to substantial lost revenues, threats to their industry and the professional standards thereof, and abrogation of the importance of licensing and regulatory compliance[.]'" The court concluded that the "Plaintiff's general allegations . . . not directly tied to injury suffered by Plaintiff—do not establish any cognizable injury as they do 'not include a single example' or give any details whatsoever as to any actual injury to Plaintiff connected to Airbnb's activities" or any allegations "concerning any current or potential clients that have been lost to, nor are there even claims stating that plaintiff operates in the same market, let alone any allegations revealing how plaintiff competes with [defendant]." *Id.* at 181.

---

[3] Airbnb is an online marketplace for individuals to list and/or book rental accommodations.

However, the Court views Plaintiff's allegations as somewhat more detailed and concrete than in *Parker.* The amended complaint alleges damages based on not only lost commissions, but also broken client agreements, resulting from Defendant's practices. Quantifying lost commissions and broken agreements will be the subject of discovery and should be addressed at the summary judgment stage.

Defendant's reliance on *EJ MGT LLC v. Defendant, Inc.*, 2021 WL 822896 (D.N.J. Mar. 4, 2021), *vacated and remanded on other grounds by* 2021 WL 5754901 (3d Cir. Dec. 3, 2021) to challenge the injuries Plaintiff alleges were caused by the Zestimates seems similarly unavailing.   In *EJ MGT LLC*, the court found no Article III standing based on the plaintiff's allegation that it was unable to sell its property because of the prominent placement location of the Zestimate for that property on Zillow's website. *Id.* at *8.  The district court concluded that the second amended complaint did not sufficiently allege that the plaintiff's damages were "fairly traceable" to Defendant's "Zestimate suppression agreements" with its preferred brokers, noting that the "Plaintiff does not allege that it lost any potential buyers to a comparable property sold by one of the Co-Conspirator Brokers in which the Zestimates were in a less prominent position," only that "two potential buyers . . . 'were turned off from considering a potential purchase of the property based on the discrepancy between the listing price and the Zestimate.'" *Id.* at *7

*EJ MGT LLC* is distinguishable in two ways. First, unlike the plaintiff in *EJ MGT LLC*, who was a homeowner, Plaintiff Demetres in this case is a real estate broker; by the nature of her trade, her livelihood depends on her ability to accurately price a home and is thus in direct competition with Zillow's Zestimates in a way that the plaintiff in *EJ MGT LLC* was not. Second, while the complaint in *EJ MGT LLC* lacked requisite allegations to make the homeowner's damages "fairly traceable" to Defendant's conduct because it could not tie the placement of the Zestimate on the website to the resulting loss, the Amended Complaint in this case alleges that Defendant's practice of publishing its "Zestimates" resulted in broken

listing agreements because she refused to use the Zestimates price as a listing price, thus sufficiently linking Plaintiff's losses to Defendant's publication of its Zestimate tool. (Am. Compl. ¶¶ 37a-b.)

Defendant's motion to dismiss for lack of standing is denied.

**B.      Consideration of Defense Counsel's Affidavit and Defendant's Website**

The Court must also determine whether Defendant counsel's affidavit should be considered as part of its motion to dismiss. Plaintiff argues that it represents a document outside the four corners of the amended complaint and is not appropriately considered on a motion to dismiss. Defendant replies that Plaintiff "admits, as she must, that her Complaint relies upon the content of Defendant's website" and, therefore, "this admission alone is sufficient for the Court to consider [it]," since attorney Berk's affidavit "merely attaches exemplars of the content and structure of Defendant's website that are publicly available." (Def.'s Reply at 4.)

"[A] district court errs when it 'consider[s] affidavits and exhibits submitted by' defendants or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss." *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000) (alteration in original) (quoting *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991); citing *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988))).

As the amended complaint makes broad allegations that implicate "structurally different [] historical versions of Defendant's website," (Pl.'s Opp'n at 8), the content of those iterations is more appropriately considered at a later stage of the case, including interpretation and assessment of the extent to which the website provides information concerning listing agents and advertising agents and how such information is used by consumers and/or how it influences their behavior. *See Energizer, LLC v. MTA Trading, Inc.*, No. 20-CV-1583 (MKB), 2021 WL 2453394, at *3 n.4 (E.D.N.Y. June 16, 2021) (declining to

consider a declaration that repeated the same legal arguments and factual challenges set forth in the briefing).

The Court will not consider Defendant counsel's affidavit in ruling on the motion to dismiss.

### C. Lanham Act Claim

Plaintiff bases Defendant's Lanham Act liability on Defendant's alleged false advertising under U.S.C. § 1125 (a)(1)(B)). "Section 43(a) of the Lanham Act prohibits any person from, 'in commercial advertising or promotion, misrepresent[ing] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.'" *Lemberg L., LLC v. eGeneration Mktg., Inc.*, No. 3:18-CV-570 (CSH), 2020 WL 2813177, at *3 (D. Conn. May 29, 2020) (quoting *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010)).  Specifically, 15 U.S.C. § 1125(a)(1)(B) states

> [a]ny person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which— in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

To state a claim for false advertising under the Lanham Act, a plaintiff must allege that: (1) "the statement in the challenged advertisement is false[;]" (2) "the defendants misrepresented an inherent quality or characteristic of the product[;]" (3) the defendant placed the false or misleading statement in interstate commerce[;]" and (4) "the plaintiff has been . . . injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (internal quotations and quotation marks omitted).

Defendant argues that the content on its website (both the appearance of the Advertising Agents and the Zestimates function) is not false within the meaning of the Lanham Act, and that Plaintiff's Amended Complaint does not sufficiently allege a misrepresentation of an inherent quality or characteristic of the product. Defendant also asserts that Plaintiff has not sufficiently alleged an injury under the Lanham Act. (*See generally* Def.'s Mem. at 11-12, 15.).

### 1.  Falsity

Defendant argues that Plaintiff's "allegation that it is improper for Advertising Agents to appear on property pages within Zillow's website" and her contention that Defendant recasts Advertising Agents as listing agents are conclusory assertions that do not demonstrate falsity. (Def.'s Mem. at 13.) Defendant further argues that Plaintiff's Zestimates claims likewise do not allege falsity because Zestimates are Defendant's opinion of the value of properties which are not actionable. (*Id.* at 14 (citing Am. Compl. ¶ 38).)

Section 43(a) covers statements which are literally false, as well as statements which, although literally true, create false impressions. *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001). For literal falsity, a plaintiff must show that the advertisement either makes an express statement that is false or a statement that is "false by necessary implication," meaning that the advertisement's "words or images, considered in context, necessarily and unambiguously imply a false message." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). If a message is not literally false, a plaintiff still may allege that it is impliedly false if the message leaves "an impression on the listener or viewer that conflicts with reality." *Id.* at 153.

Plaintiff's Amended Complaint does not support an inference that Defendant's Zestimates tool constitutes either kind of falsity under the Lanham Act. Because she does not plead that Defendant has made expressly false statements, she must allege that Defendant's use of the Zestimates tool leaves an impression on visitors to its website that conflicts with

reality. To this end, the Amended Complaint alleges that "the defendant's Zestimate publishes the defendant's own, self-devised, internally-standardized opinion of the value of the particular property," (Am. Compl. ¶ 36), "illegally competes with the actual listing price that is developed through proper industry appraisal standards," (*id.*), and "misleads and deceives agents, home sellers and purchasers as to the market value of properties." (*Id.* ¶ 38b). However, the description falls short of identifying a specific advertising statement made by Defendant that plausibly gives visitors to its site a false impression of the Zestimate tool by misrepresenting what the tool is, what it does, or even a particular home estimate produced by the Zestimate tool that allegedly conflicts with the real market value.

While Plaintiff claims that the Zestimate constitutes a falsity by its very nature as a "*de facto* appraisal," (Pl.'s Opp'n at 5), the Zestimates tool must involve "statements of fact" to constitute a violation of the Lanham Act. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08CV0442(DLC), 2016 WL 815205, at *8 (S.D.N.Y. 2016). The facts alleged do not establish any false statements—only Defendant's "**opinion** of the value of properties." (Am. Compl. ¶ 38 (emphasis added).) *See Randa Corp. v. Mulberry Thai Silk, Inc.*, No. 00CIV.4061(LAP), 2000 WL 1741680, at *2 (S.D.N.Y. 2000) (concluding that "a prediction about a possible business trend" is "[a]t most, [ ] mere puffery" because it cannot be proven true or false); *see also Golden*, 61 F.3d at 1051 ("[S]tatements of opinion are generally not the basis for Lanham Act liability."). At oral argument, Plaintiff counsel argued that even though Zillow claims that its Zestimate is only an opinion, the reality is that consumers are viewing it as a factual statement of the home's value due to Zillow's popularity and influence in the housing market. However, an implied falsehood claim "invites a comparison of the impression, rather than the statement, with the truth." *Time Warner Cable, Inc.*, 497 F.3d at 153. Plaintiff does not claim that the Zestimates were an *incorrect* estimate of the property's value—only that it was different from her own appraisal as the listing agent.

On the other hand, Plaintiff has plausibly alleged that Defendant's inclusion of Advertising Agents on its site creates a false impression that the Advertising Agents, who pay Defendant for access, are the listing agents for a given property, misrepresenting Defendant's relationship with listing agents and the Advertising Agents alike.

> On defendant's platform, prospective homebuyers are deliberately re-routed in their attempts to reach the actual listing agents for properties they are interested in, away from the agents with the most connection to the property. For example, when a consumer views a particular property it may be offered what appears to be a URL link to reach the listing agent, but when it is clicked on the consumer is again sent straight to a screen asking it to provide lead information to an Advertising Agent. In fact virtually any [] place where a consumer clicks further upon a particular listing it is viewing will lead the consumer in a perpetual loop, over and over again to an Advertising Agent button.

(Am. Compl. ¶ 12.) Plaintiff's description of how Advertising Agents are listed on Defendant's website displaying an option for a customer to contact a listing agent, which does not in fact allow the customer to contact the listing agent, is a falsity actionable under the Lanham Act. *See Time Warner Cable, Inc.*, 497 F.3d at 153.

### 2. Inherent Quality or Characteristic

Defendant maintains that "an Advertising Agent simply appearing on the same webpage as a posted property does not misrepresent any product or services' 'inherent quality or characteristics.'" (Def.'s Mem. at 12.) Whether Plaintiff has alleged that the misrepresentation of the Advertising Agents represents an "inherent quality or characteristic" of Zillow's product, *Merck Eprova AG*, 760 F.3d at 255, depends on whether it is material, i.e., "it would influence the purchasing decision of the consumer." *N. Am. Olive Oil Ass'n v. D'Avolio Inc.*, 457 F. Supp. 3d 207, 222 (E.D.N.Y. 2020), *appeal withdrawn*, No. 20-1688, 2020 WL 5083332 (2d Cir. July 30, 2020) (citing *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997).[4]

---

[4] However, "'the essential elements of the materiality standard . . . appear to be somewhat unsettled in [the] circuit,'" focusing post-*NBA* on "'the inherent quality or characteristic'

Construed most favorably to Plaintiff, the Amended Complaint alleges Defendant's inclusion of the Advertising Agents confuses visitors to the website and misleads them into thinking that Defendant has business relationships with property listing agents when in reality, Defendant has business relationships with Advertising Agents. (*See* Pl.'s Opp'n at 16.) But this reading of the Amended Complaint does not plausibly allege that Defendant has misrepresented an inherent quality or characteristic of its website; instead, it conflates false advertising for false association.[5] *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014) (noting that false advertising and false association are distinct bases of liability under the Lanham Act). At oral argument, Plaintiff's counsel presented a slight variation of her argument that the inherent quality or characteristic is misrepresented when Zillow presents itself as a resource to consumers when in fact, it is an advertising platform for agents. However, as Defendant's briefing points out, "[a]lmost all web sites, like almost all newspapers and magazines, try to finance their operations by selling ads," (Def.'s Mot. at 21) (citing *Patel*, 915 F.3d at 449), and Plaintiff does not explain how the mere act of placing advertisements on a website that consumers also view as a resource misrepresents an inherent quality or characteristic. Without a viable legal theory as to how Defendant's

---

descriptor,' not on the effect on consumers' purchasing decisions." *Energizer, LLC*, 2021 WL 2453394, at *4 (quoting *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 70 n.10 (2d Cir. 2016)).

[5] While false association is a viable claim under the Lanham Act under U.S.C. § 1125 (a)(1)(A), it would require Plaintiff to allege, among other things, that Defendant used Plaintiff's trademark or likeness. *See Gibson v. SCE Group, Inc.*, 391 F.Supp.3d 228 (S.D.N.Y 2019) (misappropriation of trademark); *Geiger v. C&G of Groton, Inc.*, 424 F. Supp. 3d 276, 291-93 (D. Conn. 2019) (misappropriation of image). Plaintiff does not allege any facts to support such a claim.

inclusion of the Advertising Agents is an advertisement that misrepresents an inherent quality or characteristic of Defendant's website, Plaintiff's claim fails.[6]

Because the Zestimates aspect of the claim fails on falsity, and the Advertising Agent aspect fails on misrepresentation of an inherent quality or characteristic, Plaintiff's Lanham Act claim is dismissed.

### D.    Sherman Antitrust Act Claims

Plaintiff also alleges that Defendant violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. Defendant assails Plaintiff's definition of the relevant product market in which she claims trade was restrained or monopolized by Defendant: "the residential real estate market in Connecticut." (Def.'s Mem. at 17-18; Pl.'s Opp'n at 18.)

To succeed on a Sherman Antitrust Act claim, a plaintiff must allege a relevant market and "how defendants' activities comprised an unreasonable restraint of trade." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). At the motion to dismiss stage, "an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001). "Though 'market definition is a deeply fact-intensive inquiry [and] courts [therefore] hesitate to grant motions to dismiss for failure to plead a relevant product market,' '[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.'" *Chapman v. New York State*

---

[6] Whether Plaintiff has plausibly alleged damages in the form of lost business relationships will not be addressed because she does not plausibly allege a viable claim under the Lanham Act.

*Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Todd*, 275 F.3d at 199-200; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997)).

      As Defendant's counsel observed at oral argument, Plaintiff's definition of the market does not allege what specific service or services are included in that market or whether interchangeable alternatives outside of that market are available. For example, Defendant pointed out that the Amended Complaint is silent on the potential effects of competitor websites like Redfin or Realtor.com on Defendant's ability to engage in anticompetitive behavior or monopolize the market. *Cf. US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 49, 65 (2d Cir. 2019) (plaintiff sufficiently defined a market for global distribution services (an electronic network used by travel agents to find and book airline flights) where it alleged that alternative distribution services were not interchangeable, that there was no cross-elasticity of demand, and that travel agents tended to use the platform exclusively and rarely switched, that Defendant made it difficult to switch to another service, and that agents were incentivized to use Defendant's service through use of minimum booking numbers or productivity pricing). Instead, the Court is left with a product market definition too broad to evaluate whether it is plausible that Zillow is the dominant giant Plaintiff claims, or whether the facts instead reflect that Zillow is merely a competitor seeking to distinguish itself from the pack.

      Because the definition of the product market is a prerequisite for evaluating whether Defendant was engaging in concerted conduct with anticompetitive effects on the market under Section 1, or whether Defendant was attempting to monopolize it under Section 2, Plaintiff's lack of specificity is fatal to both its claims under the Sherman Act. *See Chapman*, 546 F.3d at 238; *see also Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 447 (S.D.N.Y. 2008).

      However, there is a second and independent basis to dismiss: the Amended Complaint does not plausibly allege violations under Sections 1 or 2 of the Sherman Antitrust Act.

### 1.  Section 1

The Sherman Act prohibits an "unreasonable restraint" of trade under Section 1 *only* if it is "effected by a contract, combination, or conspiracy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal citations and quotations omitted). Thus, the "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express," such as "a combination or some form of concerted action between at least two legally distinct economic entities." *Id.* (alteration in original, citation omitted); *Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). "Agreements within the scope of § 1 may be either 'horizontal,' i.e., 'agreement[s] between competitors at the same level of the market structure,' or 'vertical,' i.e., 'combinations of persons at different levels of the market structure, e.g., manufacturers and distributors.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (citing *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972)).

Defendant correctly argues that none of the conduct described in the Amended Complaint can plausibly be considered to allege an agreement or concerted action with an unlawful objective. Plaintiff alleges that Defendant's web platform allows Advertising Agents "to directly advertise to and directly solicit to prospective homebuyers via other agents' exclusive listings," that Defendant "allows [its] customers to consciously engage in advertising that, *de facto*, is otherwise in violation of disclosures and other compliance measures required by the laws of the state of Connecticut," and that Defendant misleads potential homebuyers because "it is not evident to the prospective buyer that defendant is more interested in connecting that consumer with a broker who has paid a fee to defendant." (*See* Am. Compl. ¶¶ 15, 18, 33.) However, none of these allegations demonstrate a "common motive to conspire," and Plaintiff produces no "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, [or] evidence of a high level of interfirm communications." *Citigroup, Inc.*, 709 F.3d at 136; *see,*

*e.g.*, *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) ("If we permit antitrust plaintiffs to overcome a motion to dismiss simply by alleging parallel conduct, we risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy.").[7]

Instead, these facts lead to an inference that at most, Defendant has engaged in vertical agreements by charging a fee to funnel prospective homebuyers who visit its web platform to various Advertising Agents. (*See, e.g.*, Am. Compl. ¶ 38m.) Vertical relationships may constitute agreements prohibited by antitrust law, such as in "'hub-and-spoke' conspiracies . . . [which] consist of *both* vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the [hub's] terms,' often because the spokes 'would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing.'" *United States v. Apple, Inc.*, 791 F.3d 290, 348 (2d Cir. 2015) (internal quotations and citations omitted). However, Plaintiff does not plausibly allege that the Advertising Agents were each in a conspiracy with Defendant and with each other to exclude Plaintiff and others from the advertising market, because she does not allege that she was prevented in any way from simply paying for the same advertising space on Defendants' website as the Advertising Agents.

In the absence of any such allegations, the Court dismisses Plaintiff's Section 1 claim.

## 2. Section 2

Section 2 of the Sherman Act requires a plaintiff to "establish '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior

---

[7] No horizontal agreement is alleged at all because Plaintiff does not allege that Defendant and the Advertising Agents were competitors who agreed on an unlawful objective.

product, business acumen, or historic accident." *PepsiCo, Inc. v. Coca-Cola, Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). "[E]valuating market power begins with defining the relevant market." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).

Market power is "[t]he core element of a monopolization claim." *Id.* (citation omitted). It "is the power 'to force a purchaser to do something that he would not do in a competitive market.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462, (1992). Alternatively, it is "the ability of a single seller to raise price and restrict output.'" *Id.* (citations omitted). To determine if a monopoly is plausible, "a court must inquire 'into the relevant product and geographic market and the defendant's economic power in that market.'" *Queen City Pizza*, 124 F.3d at 442 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993)).

Plaintiff alleges that Defendant seeks to acquire monopoly power by "actively purchas[ing], and continu[ing] to pursue the acquisition of, other digital platforms that offer vendor services to participants in the residential real estate market so that defendant will have access to confidential consumer information." (Am. Compl. ¶ 38 *et. seq.*) Plaintiff maintains that Defendant then uses this information to monopolize (or attempt to monopolize) "the residential real estate market through the publication of its Zestimates and the de facto listing of properties with agents wholly unaffiliated with the properties," and that Defendant attempts "to appear as an arm's length market-maker for each community's entire inventory of real estate, when in fact defendant has a fully vested financial interest that is contrary to public use and perception of the market it generates from its digital platform." (*Id.*)

These allegations do not support a plausible inference that Defendant has willfully acquired the power to force potential home buyers in Connecticut to do something that they would not do in a competitive market. That the "defendant is principally in the business of

selling advertising to agents who are incentivized to discourage the buyer from further pursuing the home they were initially interested in considering for purchase," (Am. Compl. ¶ 24), is hardly out of the ordinary. *See Patel v. Zillow, Inc.*, 915 F.3d 446 (7th Cir. 2019) ("Almost all web sites, like almost all newspapers and magazines, try to finance their operations by selling ads.") In fact, this allegation in the Amended Complaint suggests a contrary inference—that Defendant's activities cause consumers to *expand* their choices.[8] *See, e.g.*, *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488 (1977) (finding no antitrust injury where the defendant had preserved, rather than dampened, competition by acquiring a number of the plaintiff's bowling alley competitors that would otherwise have gone out of business).

The Amended Complaint is additionally infirm with respect to the harm Plaintiff alleges was caused by Defendant's activities:

> Plaintiff is harmed by this over-pricing and advertising and kept from fairly accessing advertising services; plaintiff is also harmed by payments she has made to Advertising Agent subscriptions that were more expensive than they would have been in a fairly competitive market; additionally, the Advertising Agents are harmed by over-paying for the advertising that it buys.

(Am. Compl. ¶ 38m.) A plaintiff must allege "more than just that he [or she] was harmed by defendants' conduct." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 127 (2d Cir. 1995). Instead, the injury alleged "should reflect the anticompetitive effect either of the

---

[8] Plaintiff's Amended Complaint also alleges that

> defendant is attempting to monopolize – and in some circumstances does monopolize – the residential real estate market through its burgeoning direct purchase program whereby defendant purchases title to properties for itself through a sales process that is inaccessible to plaintiff, and others similarly situated, which allows defendant to self-validate its own artificial Zestimates and unfairly control the market.

(Am. Compl. ¶ 38l.) However, there is no mention anywhere else in the Amended Complaint of this "direct purchase program," nor does Plaintiff allege facts permitting a plausible inference that this program harms market consumers by manipulating prices.

violation or of anticompetitive acts made possible by the violation." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994). Plaintiff's alleged injury is similar to that alleged in *Balaklaw*, where the Second Circuit dismissed claims that a hospital violated antitrust laws by entering into an exclusive contract with a group of anesthesiologists of which the plaintiff was not a member, concluding that this sort of injury was not antitrust injury because "Dr. Balaklaw's claimed injury came as a result of his losing out in the competition for an exclusive anesthesiology contract at [the hospital], and nothing more." 14 F.3d at 798. Here, as in *Balaklaw*, Plaintiff's allegations focus on Defendant's use of its platform to commodify its ability to promote certain real estate agents (the Advertising Agents) to the exclusion of others unwilling or unable to pay Defendant's fees. Plaintiff's alleged loss of competitive standing, however, without more, is not an injury that the federal antitrust law was designed to prevent.

Therefore, the Court dismisses Plaintiff's Section 2 claim.

### E.   State Law Claims

#### 1.   CUTPA

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). CUTPA claims can be based on either an "actual deceptive practice" or an unfair practice—that is, a "practice amounting to a violation of public policy." *Ulbrich v. Groth*, 310 Conn. 375, 409 (2013). An act or practice is actually deceptive under CUTPA when there is: (1) "a representation, omission, or other practice likely to mislead consumers"; (2) the consumer "interpret[s] the message reasonably under the circumstances"; and (3) "the misleading representation, omission, or practice [is] material—that is, likely to affect consumer decisions or conduct." *Smithfield Assocs., LLC v. Tolland Bank*, 86 Conn. App. 14, 28 (2004) (internal quotation marks omitted). To determine whether an act or practice is unfair under CUTPA, Connecticut courts look to the following factors:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

*Ulbrich*, 310 Conn. at 409, 78.

At oral argument, Plaintiff's counsel argued that the same facts supporting the Lanham Act claim independently supported a CUTPA claim even if a Lanham Act claim fails. *See Murphy*, 923 F.2d at 929 (considering CUTPA claim after dismissing trademark claim based on the same conduct).

Defendant argues its Zestimates tool cannot violate a statute, public policy, common law, or constitute unethical or oppressive conduct, because a Zestimate is not a representation of fact, but an opinion, which cannot form the basis for a CUTPA claim. (Def.'s Mem. at 26-27.) In *Patel v. Zillow, Inc.* the Seventh Circuit affirmed a district court's ruling that "Zestimates are opinions, which canonically are not actionable" under the Illinois Uniform Deceptive Trade Practices Act (IUDTPA). 915 F.3d at 448. In coming to that conclusion, the court reasoned "that Zillow sells ads to real estate brokers does not affect the statutory analysis," noting that "[a]lmost all web sites, like almost all newspapers and magazines, try to finance their operations by selling ads. That they do so without telling customers exactly what pitches are being made to potential advertisers does not convert a declared estimate into an inaccurate statement of fact." *Id.* at 449.

Plaintiff does not elaborate on why *Patel* should not apply beyond her Lanham Act claim, and fails to distinguish the Zestimates tool from Defendant's opinions on the market value of residential real estate, which cannot be the basis for a claim for a CUTPA violation. *See Anthem Sports, LLC v. Under the Weather, LLC*, 320 F. Supp. 3d 399, 420 (D. Conn. 2018).

However, Plaintiff has also alleged that the advertising relationships Defendant has with real estate agents and brokers violate CUTPA. Plaintiff has plausibly alleged that

Defendant's inclusion of Advertising Agents on its site creates a false impression that the Advertising Agents, who pay Defendant for access, are the listing agents for a given property, and misrepresents Defendant's relationship with listing agents and the Advertising Agents alike. (*See* Am. Compl. ¶ 12.) Unlike the Zestimates tool, Plaintiff's description of Defendant's website (if accurate) plausibly alleges that Defendant's display of an option for a customer to contact the listing agent, which does not in fact allow the customer to contact the listing agent, is a device that could support a claim of a deceptive practice under CUTPA.

CUTPA further provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages." Conn. Gen. Stat. § 42-110g(a). "The ascertainable loss requirement [of § 42-110g] is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief." *Marinos v. Poirot*, 308 Conn. 706, 713 (2013) (alteration in original) (internal quotation marks and citation omitted). And "for purposes of § 42-110g, an ascertainable loss is a deprivation, detriment [or] injury that is capable of being discovered, observed or established" and "is ascertainable if it is measurable even though the precise amount of the loss is not known." *Id.* at 714 (alteration in original) (internal quotation marks and citation omitted).

While Defendant maintains that Plaintiff has not adequately alleged an ascertainable loss associated with the alleged misconduct, (Def.'s Mem. at 27-28), Plaintiff's claimed lost business relationships and commissions are sufficient to survive a motion to dismiss. (*See* Am. Compl. ¶¶ 37a-b). Defendant's arguments that the ascertainable loss was caused by Plaintiff's own decisions, rather than the Zestimate itself, poses a factual question reserved for resolution at summary judgment or trial; at the motion to dismiss stage, the Court will accept Plaintiff's allegations that she incurred losses "as a result of" Defendant's Zestimate program as true. (*See id.*)

Therefore, Defendant's motion to dismiss the CUTPA claim is denied.

### 2.   Tortious Interference of Contract

Under Connecticut law, "[a] claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Rioux v. Barry*, 283 Conn. 338, 351 (2007) (citing *Robert S. Weiss & Associates, Inc. v. Wiederlight*, 208 Conn. 525, 535-36 (1988)). However, not every act disturbing a contract is actionable, as the Connecticut Supreme Court explains in *Larsen Chelsey Realty Co. v. Larsen:*

> [A]n action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means . . . . [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself.

232 Conn. 480, 502 n.24 (1995) (Internal quotation marks and citations omitted). The "tortious" conduct element may be satisfied by allegations that "the defendant was guilty of fraud, misrepresentation, intimidation or molestation or that the defendant acted maliciously." *Robert S. Weiss & Associates, Inc.*, 208 Conn. at 536.

Defendant maintains that the allegations in the Amended Complaint about the Advertising Agents on Defendant's website cannot support a tortious interference claim because those allegations claim loss of future (rather than already-formed) contracts. (Def.'s Mem. at 28-29.)  As to Zestimates, Defendant argues that Plaintiff's allegations are too vague as to what contracts she alleged Defendant interfered with. (*Id.*)

Plaintiff has pled "that [Plaintiff's loss of] contractual relationships between herself and her clients were deliberately caused by the actions of defendant under circumstances where defendant was aware of the contract and that it was interfering with it to the harm of plaintiff." (Pl.'s Opp'n at 25-26; Am. Compl. ¶¶ 12, 37, and 38.) Plaintiff alleges that "[t]he

actions of the defendant have interfered with the contractual relationships plaintiff has with her clients" and Defendant has done so by "mislead[ing] and deceiv[ing] agents, home sellers and purchasers as to the market value of properties" while "knowing that said contractual relationships existed; while knowing it was interfering with these relationships; and with the intention of interfering with these relationships." (Am. Compl. ¶¶ 38b, 67-68.) Plaintiff further alleges that "Property sellers" and "[p]roperty buyers under contract with plaintiff have broken their agreements with plaintiff" due to Defendant's conduct. (*Id.* ¶¶ 37a-b.)

These allegations plausibly support a viable claim for tortious interference, and Plaintiff was not required to include proof at the motion to dismiss stage that actual contracts exist. *Bulldog New York LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152, 164 n.1 (D. Conn. 2014), on which Defendant relies, considered a plaintiff's tortious interference claim at the summary judgment stage and construed the plaintiff's tortious interference with a contractual relationship claim as a tortious interference with a business opportunity absent evidence of a pre-existing contract. *Id.* As such, *Bulldog* does not support Defendant's position that Plaintiff's Amended Complaint must identify a specific contract at this stage. Whether Plaintiff has proof of a contract, and proof of Defendant's knowledge and tortious conduct, is a question for summary judgment.

Defendant's motion to dismiss Plaintiff's tortious interference claim is therefore denied.

### F.    Injunctive Relief

"[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law." *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 51 (2d Cir.1996). "This rule against broad, vague injunctions 'is designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed,' and to be sure 'that the appellate court knows precisely what it is reviewing.'" *Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir.1997).

24

The Amended Complaint seeks an injunction directing Defendant "to correct the challenged practices." (Am. Compl., at 22). If the Court were to find Defendant's practices unlawful, the Court may fashion a remedy enjoining Defendant from engaging in those specific practices. For example, if the Court found that Defendant's mechanism for displaying advertising agents on its website violates CUTPA, the Court could enjoin Defendant from using Advertising Agents in that manner by requiring it to make it clearer to consumers the role of these Advertising Agents on its website. Thus, the scope of Plaintiff's injunctive relief is focused on specific practices, and Defendant's motion is denied as to injunctive relief. *See S.C. Johnson & Son*, 241 F.3d at 240 (affirming a district court's order enjoining a party from disseminating specific advertisements).

## V.   Conclusion

For the foregoing reasons, the Court DENIES Defendant's motion to dismiss for lack of standing, CUTPA and Tortious Interference claims; it GRANTS Defendant's motion to dismiss Plaintiff's Lanham Act and Sherman Antitrust Act claims. The parties shall file a supplemental 26(f) Report in 14 days.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of September 2022